

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Northern Division*

---

*Thomas M. DiBiagio*
*United States Attorney*

*Lisa M. Griffin*
*Assistant United States Attorney*

*6625 United States Courthouse*
*101 West Lombard Street*
*Baltimore, Maryland 21201-2692*

*410-209-4800*
*TTY/TDD:410-962-4462*
*410-209-4891*
*FAX 410-962-3124*

February 26, 2003

Robert N. Pelier, Esquire
1431 Ponce De Leon Blvd.
Coral Gables, Florida 33134

      Re:    $184,759.06 U.S. Currency
             USC Case No. 2002-1303-000071-01 and 2002-1303-000072-01

Dear Mr. Pelier:

      The following agreement is proposed regarding the above-referenced matter. Once the agreement is fully executed and returned to me, I will forward it to the appropriate agency official for disposition.

## SETTLEMENT AGREEMENT

      This Settlement Agreement is made between Jose Luis Farah and Borden International, Inc. ("Claimants") and the United States ("Government"):

      WHEREAS, the Claimants filed a claim to the defendant $184,759.06 in U.S. Currency; and

      WHEREAS, the Claimants neither admit nor dispute the Government's assertion that reasonable cause existed for the seizure of the defendant property; and

      WHEREAS, the parties wish to reach a fair and expedited resolution of this matter, the parties state:

      1.    On May 29, 2002, a seizure warrant was issued by U.S. Magistrate Judge Susan K. Gauvey authorizing the United States to seize $78,553 in Bank of America account number 3871457189 and $106,206.06 in Gulf Bank account number 20200027235-10 ("the accounts"). As

**EXHIBIT A**

a result of the seizure warrants, a total of $184,759.06 was frozen in the accounts. An administrative forfeiture action was instituted by the United States Customs Service. Claimants are the holders of these bank accounts. This forfeiture action arose out of the laundering of drug proceeds into Claimants' bank accounts at the direction of Colombian money brokers who work for Colombian narcotics traffickers. Drug proceeds involved in a money laundering offense are subject to forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(A) and 984.

    2.    The parties agree that the facts of this case are entirely consistent with a common scheme for laundering money through what is known as the Black Market Peso Exchange. Under this scheme, Colombian money brokers facilitate the exchange of U.S. dollars and other currencies (principally Colombian pesos) between narcotics traffickers and South American businesses or investors, with the money broker earning a sizeable commission for his services. The scheme is successful because drug dealers hold large quantities of U.S. dollars derived from drug trafficking that they need to convert to local currencies, while businesses or individuals in South America seek U.S. dollars to pay for the importation of goods or services, or for other offshore investments, while avoiding local governmental scrutiny, taxes, duties, and/or red tape associated with legitimate currency exchange mechanisms in their countries.

    In a typical case, the broker seeks out or is approached by Colombian drug traffickers who hold drug proceeds in the form of U.S. dollars in the United States. The broker agrees to buy the drug dollars for a specific price, and agrees to pay the drug dealer in local currency. The broker then finds or is contacted by a customer in Colombia or another South American country who desires to purchase U.S. dollars. The broker negotiates a dollar/peso exchange rate with his customer and the customer tells the broker where the U.S. dollars thus purchased need to be sent or delivered.

    Based upon the customer's instruction, the broker, in coordination with the drug traffickers, causes drug proceeds in the form of U.S. dollars to be wire-transferred to the account the customer has designated. Occasionally, this account is the customer's own account, but more frequently the customer designates the account of a fourth party i.e. a vendor of goods or services who has sold such goods or services to the broker's customer, has sent the customer an invoice, and is awaiting payment in U.S. dollars. Wire transfers constitute a common form of payment, but dollars are also delivered to peso exchange customers, or to their designated fourth parties, in the form of cash and other negotiable instruments, such as cashier's checks, postal orders, money orders or checks endorsed to unnamed payees.

    The broker, in the meantime, will transfer the pesos or other local currency received from his customer to the drug traffickers, in accordance with the drug trafficker's instruction. Such payments are in the form of cash, or in the form of peso checks made out to fictitious parties, checks in blank payee form, multiple checks in small denominations made payable to numerous payees, or any combinations of these forms, so that they are readily negotiable and virtually untraceable.

    Thus, without using formal currency exchange mechanisms, drug traffickers convert drug dollars they held in the U.S. into local currencies for use in South America, and businesses or

individuals convert local currencies into U.S. dollars that they then use to make investments or to satisfy debts owed to vendors of goods or services. It is common knowledge throughout Colombia and other South American countries that the overwhelming majority of U.S. dollars purchased through black market peso exchange involves drug proceeds. Moreover, companies in the United States, Europe and elsewhere, who do a high volume of business in Colombia and other South American drug-source countries, know or should know about this underground method of obtaining U.S. dollars, particularly in instances where the payment of invoices for goods or services sold to South American customers comes not from the customer directly, but in the form of a wire transfer, cash payment, or delivery of negotiable instruments made payable in blank for or to other payees from a third-party bank account in the United States.

3. The Claimants contend that they are <u>bona fide</u> purchasers or "innocent owners" of any drug proceeds wired into their account. In particular, Claimants maintain that the drug proceeds they received were for pesos exchanged with a licensed money broker. Claimants further assert that they did not know, had no reason to know, nor were willfully blind to the fact that funds wired into their account were the proceeds of drug trafficking.

4. The United States contends that Claimants knew or should have known that they were receiving funds through the Black Market Peso Exchange and the Claimants therefore would be unable to satisfy its burden of proof under the law. The factors that should have put Claimants on notice that they were receiving funds subject to forfeiture included, but were not limited to, the following: 1) the money broker was located in Cali, Colombia, in a region of the world known as the source of illegal drugs and also known as a place where U.S. dollars derived from drug trafficking are routinely sold on the black market; 2) the funds came from a third party or third parties unknown to the Claimants; and 3) the currency transaction was at a more favorable exchange rate than that available in banks. The United States contends that Claimants' blind reliance on their broker, who arranged the transactions was not objectively reasonable.

5. Claimants and the United States share the goal of insuring that legitimate sales and banking channels are not utilized by drug traffickers and drug organizations to launder their illegal proceeds from drug transactions.

NOW, THEREFORE, for the foregoing reasons and for good and substantial consideration, the adequacy and receipt of which is hereby acknowledged, the Claimants and the Government agree as follows:

1. The term "Claimants" as used herein includes Claimants' principals, subsidiaries, successors, representatives, agents, designees, assigns, partners, officers, and directors;

2. The parties hereto have entered into this agreement freely and without coercion. The parties to this agreement further acknowledge that they have read the provisions of the agreement, that they fully comprehend its provisions, and are prepared to abide by them. The parties further stipulate that this agreement embodies all of the agreements between the parties and that the parties have not relied upon any representation or statement not included herein;

3. This agreement resolves all issues raised by the United States as to the defendant property and as to any funds the Government was authorized to seize, by authority of the May 29, 2002 seizure warrant, from Bank of America account number 3871457189 and Gulf Bank account number 20200027235-10. The parties accept this agreement as final and binding as to all issues raised by the United States concerning these funds;

4. Claimants agree to withdraw their administrative claims and consent to the administrative forfeiture of $92,379.53 of the funds seized to the government, relinquishing all right, title and interest therein. The United States agrees and stipulates to the return of the remaining $92,379.53 to:

> Robert N. Pelier, Esquire
> 1431 Ponce de Leon Blvd.
> Coral Gables, Florida 33134;

5. The parties hereby waive all rights to appeal or to otherwise challenge or contest the validity of this agreement;

6. Claimants acknowledge that they have been made aware of the operation the of money laundering system known as the Black Market Peso Exchange and the role that system plays in the laundering of drug proceeds that are in the form of U.S. dollars. Claimants also acknowledge that they have been made aware of the role that investors and vendors of goods and services may play in the consummation of such money laundering offenses when they accept payment in the form of U.S. dollars from third parties who are not known to them;

7. Claimants shall use due diligence to confirm that all payments they receive from any individual or entity that involves currency exchanges are made through legitimate international banking channels (i.e., wire transfers from domestic or foreign accounts held in the name of a known individual or entity to Claimants' U.S. accounts).

8. Claimants covenant and agree to and do hereby forever release, save and hold harmless the United States and its officials, officers, employees, and agents from any claim, liability, obligation, appeal, action or demand, known or unknown, existing or arising in the future, in connection with, arising out of, or incident to all property arrested and/or seized, and/or forfeited in this action, brought by any person or entity;

9. Claimants agree that this agreement does not entitle them to seek or to obtain attorney's fees as a prevailing party under the Equal Access to Justice Act, 28 U.S.C. § 2412, and Claimants, further waive any rights to attorney's fees, costs, and expenses that may arise under said provision of law or any other provision; and

10. Claimants expressly waive any claim or right of action they may have against the United States, or any of its agencies, departments, employees or agents, for violation of its Constitutional,

statutory, or personal rights, which may entitle it to collect pecuniary or punitive damages, attorney's fees, or costs, including, but not limited to, actions pursuant to Title 42, United States Code, Section 1983, the Federal Torts Claims Act, or any cause of action for the violation of any Constitutional or statutory rights. As to any possible tax obligations owed to the United States, the terms of this agreement do not affect the tax obligations, tax fines, tax penalties, or any other tax obligations that Claimants may owe the United States government.

Very truly yours,

Thomas M. DiBiagio
United States Attorney

2/26/03
Date

By: _____
Lisa M. Griffin
Assistant United States Attorney

3-17-03
Date

_____
Jose Luis Farah

3-17-03
Date

_____
President
Borden International, Inc.

3-18-03
Date

_____
Robert N. Pelier, Esquire

5